## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID E. RICKETTS; | : |
| Plaintiff, | : NO. 1:CV-07-0049 |
| | : |
| v. | : JUDGE RAMBO |
| | : |
| THE UNITED STATES OF AMERICA; | : |
| THE FEDERAL BUREAU OF PRISONS | : |
| FEDERAL PRISON INDUSTRIES, INC.; | : |
| RAYMOND LAWS; JOHN SHEESLEY; | : |
| JAY YOUNG; KEITH KRATZER; and | : |
| JOSEPH V. SMITH; | : |
| Defendants | : Filed Electronically |

---

### PLAINTIFF'S PRE-TRIAL MEMORANDUM

---

Pursuant to Middle District Local Rule 16.6, the following is Plaintiff's Pre-Trial Memorandum:

**Date conference was held by counsel:** The conference required by Local Rule 16.3(b) was held at office of the United States Attorney for the Middle District of Pennsylvania on Thursday, November 3, 2011, at noon.

### A. A brief statement as to Federal Court jurisdiction:

Jurisdiction is pursuant to 28 U.S.C. §1331 as arising under the Constitution, laws, or treaties of the United States: specifically 28 U.S.C. 1346(b)(1).

**B. A summary statement of facts and contentions as to liability:**

On August 20, 2004, sometime prior to one o'clock p.m., David Ricketts (hereinafter "Ricketts" or "Plaintiff") was violently attacked by a fellow inmate, Richard Vardenski (hereinafter "Vardenski"), while working as a welder in the UNICOR facility at the United States Penitentiary in Lewisburg, Pennsylvania (hereinafter "USP-Lewisburg"). Vardenski viciously assaulted Ricketts from behind, stabbing him twenty-three (23) times in his upper back and neck, partially severing his spinal cord and collapsing his lung.

On July 30, 2004, USP-Lewisburg issued an Institutional Supplement containing additional mandatory regulations regarding the safety and security of tools within the UNICOR facility. See, Institutional Supplement at 2. The Supplement was adopted, in part, to prevent the use of tools in situations hazardous to institution security or individual safety. Id. Responsibility for adherence to the Institutional Supplement rested with the individual department heads. Institutional Supplement at 2.  At all times relevant to this action, all tools utilized by inmates in UNICOR were monitored and controlled in accordance with Program Statement 5500.12, Correctional Services Manual, Chapter 4, Tools and Hazardous Materials (10/10/2003) and the Institution Supplement LEW 5500.09 – Chapter 4, Tool Control (July 30, 2004).

The United States, by and through its agents and employees at USP-Lewisburg and the UNICOR facility were grossly negligent in failing to follow mandatory safety and tool security and control procedures. Vardenski foreseeably took advantage of such gross failure to secure and control inmate tool access by arming himself with a screwdriver with the premeditated[1] intent to attempt to murder Ricketts. As a result of this horrific attack, Ricketts is forced to live the rest of his life in pain and agony and in a diminished capacity because the Defendant failed to protect him and other inmates under its care from the obvious and foreseeable risks inherent in permitting known violent and volatile inmates from having unfettered access to tools capable of causing serious bodily injury.

The United States is similarly negligent in the manner the various inmates working in the UNICOR facility were supervised. Vardenski took advantage of such negligence in leaving the Millwright department without a valid reason, traveling through the UNICOR facility undetected, and committing this heinous crime. Had the UNICOR supervisors been more attentive to the movement of Vardenski through the facility, and had the Weld-2 shop been sufficiently staffed to deal with the obvious and established threat of inmate violence, Ricketts would not have nearly been killed at the hands of Vardenski.

---

[1] The Defendant determined that Vardenski had premeditated intent to attack Ricketts because of him secreting a bag of tobacco in his rectum, as tobacco is prohibited in the special housing unit where Vardenski knew he would be assigned after the attack.

Defendant, United States, contests that it is liable in this matter, and suggests that Ricketts was contributorily negligent in causing his own injuries, and/or he assumed the risk by being combative with Vardenski sometime prior to the stabbing.  Defendant contends that it was running its facility in conformance with all policies and procedures in effect during the time in question.

**C. A comprehensive statement of undisputed facts as agreed to by counsel at the conference of attorneys.**

Said statement is attached hereto as Exhibit "A".

**D. A brief description of damages, including**

**a.  Principal injuries sustained**

Twenty-three stab wounds to the left spinal region, bilateral posterior neck distribution.

Left hemopneumothorax (a combination of air and blood in the chest cavity).

Clinical Brown-Sequard syndrome (an incomplete spinal cord lesion characterized by a clinical picture reflecting hemisection of the spinal cord, often in the cervical cord region) with complete left-sided hemiplegia (total paralysis). Cervical level 4/5 left-sided facet chip fracture.

Cervical level 5 spinous process chip fracture.

Post traumatic stress disorder and depression.

### b. Hospitalization and convalescence

Plaintiff was rushed to Evangelical Community Hospital on August 20, 2004, where he was administered a chest tube (a chest tube is a flexible plastic tube that is inserted through the side of the chest into the pleural space. It is used to remove air, fluid, or pus), which drained approximately 300 cubic centimeters of blood from the left side of his chest. Because of his serious condition, Ricketts was then prepared for life flight via helicopter to Geisenger Medical Center for intensive care.

Plaintiff next treated with Geisenger in its intensive care unit from August 20, 2004 through September 7, 2004.

On September 7, 2004, Plaintiff was transferred to Devens, Massachusetts, Medical facility. He treated at Devens until April 4, 2005, when he was finally transferred to the Springfield, Missouri medical facility. Plaintiff has been treating at Springfield until the present time.

### c. Present disability

Presently, Ricketts remains confined to a wheelchair, of which it is anticipated he will remain a captive for the rest of his life. Ricketts currently suffers from hemiplegia, paralysis, chronic pain syndrome, frequent muscle spasm, gasto-intestinal difficulties, depression, anxiety and deformity due to the stabbing

that occurred on August 20, 2004.  Ricketts continued to be totally disabled from his occupation as a welder.

### d. Special monetary damages, loss of past earnings, medical expenses, property damages, etc.

Ricketts has sustained lost wages in the approximate amount of One Hundred Forty Two Thousand Seven-Hundred Forty Dollars ($142,740.00).

During the time in question, Ricketts worked ten hours per day (which included overtime), seven days a week.  He had been working that schedule since July of 2004.  Plaintiff was earning Grade 1 pay at the time of the stabbing, which rate was $1.15 per hour.  At the time of the stabbing, Ricketts had applied for Premium pay status, which pays an additional $.20 per hour.  Premium pay for a pay grade 1 inmate earning overtime would be calculated as follows:  $2.30 + .20 = $2.50 (See Program Statement 8120.02, work program for inmates, chapter 5 pages 1-3).

Plaintiff was thirty-nine (39) years old (DOB 6/28/65) on the day of the stabbing.  It was Plaintiff's desire to work as long as he was capable, at least until the age of sixty-nine (69) (thirty years).  As stated above, Plaintiff was working overtime hours during the time in question.  If Plaintiff were paid $1.35 per hour for regular time, at forty hours per week, for the next thirty years, Plaintiff would earn $84,240.00.  If Plaintiff would work overtime for half of the assumed thirty year time period (which is a reasonable expectation), Plaintiff would earn

$58,500.00.  Therefore, Ricketts has sustained lost wages in the approximate amount of One Hundred Forty Two Thousand Seven-Hundred Forty Dollars (**$142,740.00**).

Although Plaintiff's counsel requested all billing records from opposing counsel relative to Plaintiff's treatment, Plaintiff's counsel has been informed by Defendant's counsel that they do not exist.  Plaintiff's counsel has also been informed that Defendant will be waiving any request for compensation for the services it has rendered and will continue to provide to Plaintiff in the future.

Plaintiff's counsel was provided with detailed billing records from Geisinger Health System.  Those billings total **$85,585.52.**  Plaintiff has received no confirmation from Defendant, nor any other source, that this bill has been paid and that no lien exists.

### e.  Estimated value of pain and suffering, etc.

A review of jury verdict reports, settlements and bench verdicts reveals that individuals suffering from the same or similar injuries, whether caused by negligent or intentional conduct, have received substantial, multi-million dollar verdicts and/or settlements.

Based upon Plaintiff's age, health and life expectancy, and the pain and suffering he will have to endure for the rest of his life, this case is valued at Three-Million Two-Hundred Thousand Dollars ($3,200,00.00).

Plaintiff's counsel reserves the right to make a day/unit argument relative to Plaintiff's daily pain and suffering at the time of closing.

### f. Special damages claims

Plaintiff's necessary narcotic medications were completely revoked in May of 2011. Plaintiff has filed an administrative appeal to the BOP regarding revocation of his pain medication, which appeal is pending. Therefore, Plaintiff has been forced to endure additional pain and suffering, at pain levels of 10 out of 10 since May of 2011.

### E. Names and addresses of witnesses, along with the specialties and qualifications of experts to be called.

1. Donlin M. Long, M.D., Ph.D., 2328 West Joppa Road, Suite 103, Lutherville, Maryland 21093. Dr. Long is an expert in neurology, neurosurgery, neuroanatomy, and the pain, symptoms and treatment associated with injuries sustained to the neck and spinal regions.

2. David Ricketts, MCFP Springfield, PO Box 4000, Springfield, Missouri 65801.

3. Joseph Smith, on direct and/or as on cross. Mr. Smith resides at 13 Maidenbush Court, East, Homosassa, Florida 34446. Plaintiff reserves the right to read Mr. Smith's deposition testimony into the record in lieu of having Mr. Smith travel to Pennsylvania.

4. Raymond Laws, on direct and/or as on cross. Mr. Laws resides at 123 Halibut Lane, Spartanburg, SC 29303. Plaintiff reserves the right to read Mr. Laws' deposition testimony into the record in lieu of having Mr. Laws travel to Pennsylvania.

5. John Sheesley, as on cross, USP Lewisburg, U.S. Penitentiary, P.O. Box 100, Lewisburg, PA 17837.

6. Jay Young, as on cross, USP Lewisburg, U.S. Penitentiary, P.O. Box 100, Lewisburg, PA 17837.

7. Donald Rhinehart, as on cross, USP Lewisburg, U.S. Penitentiary, P.O. Box 100, Lewisburg, PA 17837.

8. Duane Miller, as on cross, USP Lewisburg, U.S. Penitentiary, P.O. Box 100, Lewisburg, PA 17837.

9. Keith Kratzer, as on cross, USP Lewisburg, U.S. Penitentiary, P.O. Box 100, Lewisburg, PA 17837.

10. David Slonaker, as on cross, USP Lewisburg, U.S. Penitentiary, P.O. Box 100, Lewisburg, PA 17837.

11. Dr. Ernesto Gapasin, as on cross, MCFP Springfield, PO Box 4000, Springfield, Missouri 65801.

12. J. Moscarello, as on cross, USP Lewisburg, U.S. Penitentiary, P.O. Box 100, Lewisburg, PA 17837.

13. Suzanne Heath, as on cross, USP Lewisburg, U.S. Penitentiary, P.O. Box 100, Lewisburg, PA 17837.

14. Richard Vardenski, as on cross, USP Canaan, U.S. Penitentiary, P.O. Box 300, Waymart, PA 18472.

15. Matthew Edinger, as on cross, USP Lewisburg, U.S. Penitentiary, P.O. Box 100, Lewisburg, PA 17837.

16. Special Agent Jonathan Cook, as on cross, FBI Field Office, El Paso, Texas.

**F. Summary of testimony of each expert witness.**

Please see Dr. Donlin Long's summary of testimony, attached hereto as Exhibit "B", along with Plaintiff's counsel's summary of Dr. Long's expected testimony.  The summary attached is not meant to encompass every portion of Dr. Long's testimony, but is merely a summary of his testimony.  Please see also counsel's electronic mail correspondence to Attorney Butler, further describing a summary of testimony of Dr. Long, attached hereto as Exhibit "C".

**G. Special comment about pleadings and discovery, including depositions and the exchange of medical reports.**

As stated above, Plaintiff reserves the right to use Mr. Laws' and Mr. Smith's depositions during trial in lieu of having them travel to Pennsylvania for trial.

**H. A summary of legal issues involved and legal authorities relied upon.**

The Federal Tort Claims Act subjects the United States to tort liability for negligence.  28 U.S.C. §§ 1346(b), 2674.  Under the FTCA, the United States is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

In order to "establish a cause of action for negligence, the plaintiff must prove the following four elements:  (1) a duty or obligation recognized by law; (2)

a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages." Pittsburgh Nat'l Bank v. Perr, 637 A.2d 334, 336 (Pa. Super. 1994) (citing Morena v. South Hills Health System, 462 A.2d 680, 684 (1983)).

Thus, "[t]he duty imposed upon a jailer vis a vis his prisoner is to exercise reasonable care and diligence to protect the prisoner from danger known to or which might reasonably be apprehended by him." Turner v. Miller, 679 F. Supp. 441, 443 (M.D. Pa. 1987) (emphasis in original) (quoting Hossic v. United States, 682 F. Supp. 22, 25 (M.D. Pa. 1987)).

While the criminal actions of Vardenski in brutally assaulting and attempting to murder Ricketts cannot be directly attributed to the Defendant, Pennsylvania law makes it clear that the negligent actor (Defendant) may be held liable for the superseding criminal act of a third-party (Vardenski) if the superseding act is a foreseeable consequence of the negligent conduct. See Mahan v. Am-Gard, Inc., 841 A.2d 1052, 1061 (Pa.Super 2003) (citing Jeffries, 379 A.2d at 115) ("[A]n actor may still be liable for his negligence despite the superseding criminal acts of another if, at the time of his negligent conduct, he realized or should have realized the likelihood that such a situation might be created and that a third party might avail himself of the opportunity to commit such a tort or crime.").

In this case, the negligence of the United States in failing to comply with tool control and security policies, negligently supervising inmates' movement throughout the UNICOR facility, and other negligent actions described herein, created the likelihood that Vardenski or any other inmate would capitalize on the negligence of the Defendant and commit a deadly assault with a wrongfully procured tool. Put simply, it was foreseeable that Vardenski or any other inmate could take advantage of the Defendant's negligent supervision of both tools and personnel to commit a vicious and deadly assault in the UNICOR facility.

### I.  Stipulations desired

See statement of undisputed facts attached hereto as Exhibit "A", as well as Defendant's counsel's responses to Plaintiff's Requests for Admission attached hereto as Exhibit "D".

### J.  Estimated number of trial days.

It is estimated that trial will last 4-5 days in this matter.

### K. Any other matter pertinent to the case to be tried.

There are pending Motions in Limine relative to Plaintiff's criminal history, alleged abuse of narcotic/prescription medications, and his alleged involvement in

heroin at Lewisburg.  It is Plaintiff's position that all of these matters are irrelevant to the question of negligence in this matter, and, therefore, should be precluded from reference during the trial.

Plaintiff's counsel must initiate the process to secure the attendance of Plaintiff at the trial, as well as in advance of trial for the purposes of trial preparation.

**L.  A prenumbered schedule of exhibits.**

See attached as Exhibit "E".

**M.  Special verdict questions.**

N/A

**N.  Defense counsel must file a statement that the person or committee with settlement authority has been notified of the requirements of and possible sanctions under Local Rule 16.2.**

N/A

**O.  Certificate must be filed as required under Local Rule 30.10 that counsel have met and reviewed depositions and videotapes in an effort to eliminate irrelevancies, side comments, resolved objections, and other matters not necessary for consideration by the trier of fact.**

N/A

**P.  In all trials without a jury, requests for both findings of fact and law shall be submitted with this Memorandum as required under Local Rule 48.2.**

See attached marked as Exhibit "F".


Respectfully Submitted,

**BENNLAWFIRM**

Date: November 10, 2011          By: 
                                    James F. Logue, Esq.
                                    PA202170
                                    jlogue@bennlawfirm.com
                                    **Gregory E. Monskie, Esq.**
                                    gmonskie@bennlawfirm.com
                                    PA206103
                                    103 East Market Street
                                    York, PA 17401
                                    P: (717) 852-7020
                                    F: (717) 852-8797
                                    Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, the undersigned, in accordance with Fed.R.Civ.P. 5, hereby certify that a copy of the foregoing **Plaintiff's Pretrial Memorandum** was served on the following individuals on the date and in the manner set forth below:

**Via Electronic Filing:**
Michael Butler, Esquire
United States Attorney's Office
228 Walnut Street
Suite 220
Harrisburg, PA 17108
(717) 221-4482

Date: November 10, 2011      By:      _____ s/ James F. Logue, Esq. _____
                                      Attorney for Plaintiff

RICKETTS v. A.W. OF UNICOR, et al.
United States District Court for the Middle District of Pennsylvania
Case No. 1:07-CV-0049

# EXHIBIT "A"

Plaintiff's Pretrial Memorandum
November 10, 2011

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DAVID E. RICKETTS; | : |
|        Plaintiff, | : NO. 1:CV-07-0049 |
| | : |
|     v. | : JUDGE RAMBO |
| | : |
| THE UNITED STATES OF AMERICA; | : |
| THE FEDERAL BUREAU OF PRISONS | : |
| FEDERAL PRISON INDUSTRIES, INC.; | : |
| RAYMOND LAWS; JOHN SHEESLEY; | : |
| JAY YOUNG; KEITH KRATZER; and | : |
| JOSEPH V. SMITH; | : |
|        Defendants | : Filed Electronically |

---

## STATEMENT OF UNDISPUTED FACTS

---

1. At all times relevant to this action, the United States Penitentiary in Lewisburg, PA (USP Lewisburg) was a High Security institution.

2. Federal Prison Industries, Inc. (UNICOR) is a wholly-owned government corporation, created by Congress in 1934 with the mission of providing work simulation programs and training opportunities for inmates confined in federal correctional facilities.

3. Organizationally, UNICOR is a component of the Bureau of Prisons (BOP).

1

4. In or about August of 2004, UNICOR was operating a factory at USP-Lewisburg.

5. At all times relevant to this case, the USP Lewisburg UNICOR factory was part of the Industrial Products Group, and was assigned to make metal containers for the United States Postal Service.

6. Plaintiff David Ricketts (Ricketts) was assigned in the Weld 2 shop at UNICOR facility at USP-Lewisburg as a welder in August of 2004.

7. In August of 2004, Ricketts was housed at USP-Lewisburg.

8. Ricketts is presently housed in a United States Medical Center for Federal Prisoners (USMCFP) in Springfield, Missouri.

9. Richard Vardenski (Vardenski) was an inmate at USP-Lewisburg in August of 2004, and was assigned in the Millwright shop in the UNICOR facility at USP-Lewisburg at that time.

10. Beginning in late 2003, Joseph Smith (Smith) became the Warden at USP-Lewisburg.

11. Smith was the Warden at USP- Lewisburg in August of 2004.

12. Raymond Laws (Laws) was the Associate Warden of Industries and Education at USP-Lewisburg in August of 2004.

13. As Associate Warden of Industries and Education at USP-Lewisburg, Laws was responsible for oversight of the UNICOR facility, among other things.

14. John Sheesley (Sheesley) was the Millwright Supervisor on August 20, 2004.

15. Jay Young (Young) was a staff member in the Millwright department in August of 2004.

16. Duane Miller (Miller) was a staff member in the Millwright department in August of 2004.

17. Donald Rhinehart (Rhinehart) was a staff member in the Millwright department in August of 2004.

18. Keith Kratzer (Kratzer) was a staff member in the welding department of UNICOR in August of 2004.

19. David Slonaker (Slonaker) was a staff member working in the Weld 2 shop in August of 2004.

20. On August 20, 2004, Vardenski assaulted Ricketts with a Philips head screwdriver while working in the UNICOR facility at USP-Lewisburg.

21. At the time of the assault, Ricketts was working in the Weld 2 shop.

22. After arriving to work in the Millwright Department at or around 12:15 p.m., Vardenski armed himself with the Phillips head screwdriver from the Millwright tool room.

23. Vardenski approached Ricketts in a welding bay where the assault occurred.

24. BOP determined that the assault was premeditated because Vardenski knew after he was discovered he would be sent to the Special Housing Unit where tobacco was not permitted so Vardenski concealed tobacco in his rectum.

25. Vardenski stabbed Ricketts in the back of the neck because "he knew this would put [Ricketts] down immediately."

26. Because Ricketts was not moving, Vardenski thought he had killed him.

27. Thereafter, Vardenski returned to Millwright.

28. Slonaker discovered Ricketts in a Weld 2 bay and put out an assistance call to other staff members.

29. At the time of the assault, Weld 2 was being supervised by Slonaker and Kratzer.

30. Ricketts identified Vardenski as his assailant to prison staff shortly after being discovered.

31. After the assault, Ricketts was rushed by ambulance to Evangelical Community Hospital Emergency Room.

32. At Evangelical Community Hospital, Ricketts was stabilized and prepared for transfer to Geisinger Medical Center ("Geisenger") for intensive care.

33. At Geisinger, Ricketts was diagnosed with the following injuries:

   a. Multiple stab wounds to the left spinal region, bilateral posterior neck distribution;

b.  Left hemopneumothorax (a combination of air and blood in the chest

cavity);

c.  Clinical Brown-Sequard syndrome with complete paralysis of the left

side of his body;

d.  Cervical level 4/5 left-sided facet chip fracture; and

e.  Cervical level 5 spinous process chip fracture.

34. Ricketts was treated at Geisinger through September 7, 2004, and was

transferred to the medical center for federal prisoners in Devens,

Massachusetts on September 8, 2004.

35. Ricketts treated at the Devens facility from September 8, 2004 through

April 4, 2005.

36. From April 4, 2005 until the present, Ricketts has been under the medical

care of the Bureau of Prisons at their medical facility in Springfield,

Missouri.

37. Ricketts is expected to remain in the care of medical staff at the Bureau of

Prisons for the remainder of his sentence.

38. Dr. Ernesto Gapasin is the primary physician treating Ricketts at the

medical facility for federal prisoners in Springfield, Missouri.

39.Donlin Martin Long, M.D., Ph.D., is an expert in neurology.


Respectfully Submitted,

**BENNLAWFIRM**


Date: November 10, 2011          By:

**James F. Logue, Esq.**
PA202170
jlogue@bennlawfirm.com
**Gregory E. Monskie, Esq.**
gmonskie@bennlawfirm.com
PA206103
103 East Market Street
York, PA 17401
P: (717) 852-7020
F: (717) 852-8797
Attorneys for Plaintiff

RICKETTS v. A.W. OF UNICOR, et al.
United States District Court for the Middle District of Pennsylvania
Case No. 1:07-CV-0049

# EXHIBIT "B"

Plaintiff's Pretrial Memorandum
November 10, 2011



**Donlin M. Long, M.D.**
Donlin M. Long, M.D.
Neurological and Spinal Consultant
2328 West Joppa Road, Suite 103
Lutherville, MD 21093
P. 410-828-7513
F. 410-828-4823

September 19, 2011                                                                     Page 1 of 2

Mr. James Logue

                Re: Mr. David Ricketts

Dear Mr. Logue:

I received your letter concerning David Ricketts and I will supply you with the following
information.

It is my opinion that Mr. David Ricketts suffered a stab wound of the cervical spinal cord from a
screwdriver attack which occurred on 08-20-2004. The examinations shortly after the injury
indicate that he had paralysis of the left side of the body, weakness of the right side of the body
particularly in the lower extremity and a mixed sensory loss involving both sides of the body.

He was thoroughly studied at the Geisinger Medical Center. There was no indication for surgery
and so he was treated with general maintenance, observation and then appropriate rehabilitation.
The diagnoses at that time were C3-4 facet fractures, C2 laminar fracture and cervical spinal cord
injury penetrating. There was a small epidural hemorrhage in the spinal canal but it had no
clinical significance.

It is my opinion the records indicate that the patient made some recovery and on 03-29-2005 his
physical examination was recorded as 4/5 strength on the right, 2/5 strength in the left upper
extremity and 3/5 strength in the left lower extremity. There was a mixed sensory loss of position
sense on the left, pain and temperature on the right and general sensation diminished in an
irregular pattern. The injury to the cervical spinal cord occurred at more than one level C2
through C6. I will describe the details of the Brown-Séquard Syndrome if asked to do so.

The records indicate that the patient has a residual left hemiparesis which requires use of a
wheelchair and he has typical spinal cord injury pain which requires medication. I will describe
the features of spinal cord injury pain.

Using the AMA Guides for Physical Impairment 5th Edition I have calculated that the patient's
whole man disability is 60% based upon his physical impairments alone. I have indicated that the
pain tables are difficult to quantify in the Guides to Impairment but that his sole disability under
those guidelines would be 80% or better. In coming to these conclusions I used the records of his
emergency care, the records of the Geisinger Medical Center from admission to discharge, the
rehabilitation records from the Federal Medical Center in Devens, MA and the records of the US
Medical Center for Federal Prisoners in Springfield, MO. I have reviewed all of the imaging
studies reports available to me informing these opinions. In addition I have used the AMA
Guidelines for Physical Impairment 5th Edition to make my decisions about whole man disability.

**Donlin M. Long, M.D.**
Donlin M. Long, M.D.
Neurological and Spinal Consultant
2328 West Joppa Road, Suite 103
Lutherville, MD 21093
P. 410-828-7513
F. 410-828-4823

September 19, 2011                                                   Page 2 of 2

Mr. James Logue

     Re: Mr. David Ricketts

I have no plans for any exhibits.  I would be happy to employ anything used by his legal counsel
to assist my explanations.

I am a board certified neurosurgeon.  I was Director of the Department of Neurosurgery at Johns
Hopkins from 1973 to 2000 and I remained Distinguished Service Professor of Neurosurgery from
2000 until 2010.  I retired in 2010 from surgical practice but continue to maintain an active
practice.  Over this period of time I was also consultant to the Montebello Hospital which manages
spinal cord injury in Maryland and a consultant to the Kennedy Krieger rehabilitation program
associated with the Johns Hopkins University School of Medicine.  I was also responsible for all
emergency care at Johns Hopkins during the entire period of time including acute spinal cord
injury.  I was a founding editor of the journal Spine and founding member of the International
Association for the Study of Pain.  A CV and a complete list of my publications are appended.  I
also include a list of depositions and trial testimonies of the previous four years.

My charge is $500 per hour with court testimony out of the City of Baltimore which varies from
$5,000 to $10,000 but typically is $7,500 for a trip and overnight stay and testimony.  My only bill
is attached.

Yours Sincerely,

Donlin M. Long, M.D.

DML.200027:jaj

RICKETTS v. A.W. OF UNICOR, et al.
United States District Court for the Middle District of Pennsylvania
Case No. 1:07-CV-0049

# EXHIBIT "C"

Plaintiff's Pretrial Memorandum
November 10, 2011

**James Logue**

| | |
|---|---|
| **From:** | James Logue |
| **Sent:** | Thursday, September 29, 2011 3:31 PM |
| **To:** | 'Butler, Michael (USAPAM)' |
| **Subject:** | RE: Ricketts |
| **Attachments:** | DonLongCV.pdf; fee schedule.pdf; expert testimony.pdf |

Hi Michael:

As a response to your Rule 26 request, attached please find Dr. Long's curriculum vitae (which is posted on his website http://donlinlong.com/ ). As you can see, the curriculum vitae lists all publications authored in the last 10 years.

Further attached is Dr. Long's fee schedule and history of expert testimony. We paid Dr. Long $1,500.00 to review all of Mr. Ricketts's medical records and to provide us with both expert reports.

The opinions that Dr. Long will express will be similar to those included in his expert reports, and he relied on all of Mr. Ricketts's medical records, reports, statements and photographs, as well as his knowledge and expertise as well as the AMA Guides to support his opinions. He may use models, diagrams, charts and/or studies and learned treatises/publications/articles to further support his position at trial. He will further use the standard life expectancy guidelines.

We reserve the right to supplement these responses.

James F. Logue, Esquire
**BennLawFirm**
103 East Market Street
P.O. Box 5185
York, PA 17405
Telephone: (717) 852-7020
Fax: (717) 852-8797
Email: jlogue@bennlawfirm.com
www.bennlawfirm.com

RICKETTS v. A.W. OF UNICOR, et al.
United States District Court for the Middle District of Pennsylvania
Case No. 1:07-CV-0049

# EXHIBIT "D"

Plaintiff's Pretrial Memorandum
November 10, 2011

PJS:MJB:dlm

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID E. RICKETTS;** | : | |
| **Plaintiff,** | : NO. 1:CV-07-0049 | |
| | : | |
| **v.** | : | |
| | : | |
| **THE UNITED STATES OF AMERICA;** | : | |
| **THE FEDERAL BUREAU OF PRISONS:** | | |
| **FEDERAL PRISON INDUSTRIES, INC.;** | : (Rambo, J.) | |
| **RAYMOND LAWS; JOHN SHEESLEY;** | : | |
| **JAY YOUNG; KEITH KRATZER; and** | : | |
| **WARDEN OF FEDERAL PRISON** | : | |
| **INDUSTRIES, INC.;** | : | |
| **Defendants** | : | |

## DEFENDANT UNITED STATES'S RESPONSE TO PLAINTIFF'S
## FIRST SET OF REQUEST FOR ADMISSIONS

Defendant, United States answers Plaintiff's First Set Of Request For

Admissions as stated below.

## PRELIMINARY STATEMENT

Defendant's responses to these Request for Admissions are based on

information presently available.  Defendant reserves the right to make changes

and/or supplement these responses at a later time to correct omissions, to reflect

more accurate information and/or documents, as provided by Rule 26 of the

Federal Rules of Civil Procedure.

**REQUEST FOR ADMISSION NO. 1**

That on August 20, 2004, David E. Ricketts (hereinafter "Plaintiff"), then an inmate at USP Lewisburg, was stabbed several times with a screwdriver by a fellow inmate, Vardenski, in the Weld 2 Shop in the UNICOR factory.

**Response to Request for Admission No. 1:**

Defendant admits the averments contained in Request for Admission No. 1.

**REQUEST FOR ADMISSION NO. 2**

That on the date in question, there were two staff members assigned to the Weld 2 Shop, Mr. Kratzer and Mr. Slonaker.  See Defendants' Joint Statement of Material Facts in Support of Motion for Summary Judgment at ¶ 35.

**Response to Request for Admission No. 2:**

Defendant admits the averments contained in Request for Admission No. 2.

**REQUEST FOR ADMISSION NO. 3**

That the Weld 3 Shop had opened for production in July of 2004.  See Slonaker Dep. at 14: 18-24; Kratzer Dep. at 62:2.

**Response to Request for Admission No. 3:**

Defendant admits that the welding operation expanded and moved into the

area known as Weld 2 Shop shortly before July of 2004.

## REQUEST FOR ADMISSION NO. 4

That on the date in question, the Weld 2 Shop was not yet prepared for "full production." See Slonaker Dep. at 27-28: 14-25. 1-7. Kratzer Dep. at 42: 12-21.

**Response to Request for Admission No. 4:**

Defendant denies the averments contained in Request for Admission No. 4.

On the date in question, the Weld 2 Shop was fully, "up and running," although

there were always modifications being made. See Laws Dep. at 26 ¶¶ 1-6;

Slonaker Dep. at 28 ¶¶ 5-7.


## REQUEST FOR ADMISSION NO. 5

That Mr. Kratzer allowed Mr. Vardenski in his shop prior to the day in question to talk and socialize with Mr. Ricketts. See Kratzer Dep. at 62-63.

**Response to Request for Admission No. 5:**

Defendant admits in part and denies in part the averments contained in

Request for Admission No. 5. Defendant admits that prior to the date in question,

Vardenski was seen by Kratzer on occasion in the welding area. Upon reasonable

investigation, however, Defendant is without information sufficient to either admit

or deny the reasons for Vardenski being in the welding area. Furthermore, to the

extent Vardenski may have been present in the welding area for improper or

inappropriate reasons, it is denied that he was allowed or authorized to engage in

such activity by Mr. Kratzer.  <u>See</u> Kratzer Dep. at 62 ¶ 12 to 63 ¶ 5.

**REQUEST FOR ADMISSION NO. 6**

That Mr. Krazter did not require inmates from other UNICOR departments to show up at the Weld 2 Shop with their tools locked up in a toolbox.  <u>Id.</u> at 71:23-25.

**Response to Request for Admission No. 6:**

Defendant denies the averments contained in Request for Admission No. 6.

Mr. Kratzer was not directly responsible for supervising inmates from other areas

within the UNICOR factory, or monitoring the manner in which they carried their

tools.  Mr. Kratzer was only directly responsible for the security of the tools

assigned to the Weld 2 Shop.  <u>See</u> Kratzer Dep. at 71 ¶¶ 21-22.

**ADMISSION NO. 7**

That immediately before the stabbing, Mr. Krazter left Mr. Slonaker as the lone supervisor in the Weld 2 Shop.  <u>Id.</u> at 50, 1-16.

**Response to Admission No. 7:**

Defendant admits in part the averments contained in Request for

Admission No. 7.  Shortly before the attack, Mr. Kratzer was nearby in the

Press Department, "looking for material, a subcomponent."  <u>See</u>

Defendants' Joint Statement of Material Facts ¶¶ 35-36; Kratzer Dep. at 14

¶¶ 4-12 and at 50 ¶¶ 6-16.

## REQUEST FOR ADMISSION NO. 8

That on date in question, UNICOR was operating with seven (7) vacancies out of forty-four (44) available positions. <u>See</u> UNICOR Field Staffing Report current as of 7/8/2004.

**Response to Request for Admission No. 8:**

Upon reasonable investigation, Defendant is without sufficient

information to either admit or deny the averments contained in Request for

Admission No. 8.  It is admitted, however, that a UNICOR Field Staffing

Report showed seven vacancies at the Lewisburg factory, out of 44

available positions on July 8, 2004.  <u>See</u> UNICOR Field Staffing Report.

## REQUEST FOR ADMISSION NO. 9

That there exists no video surveillance tape of the Weld 2 Shop, or any UNICOR shop, from the date in question.

**Objection to Request for Admission No. 9:**

Defendant objects to the request on the basis that release of this information could adversely impact the security and safe operation of the United States Penitentiary at Lewisburg, Pennsylvania and other BOP institutions across the country.

**Response to Request for Admission No. 9:**

Defendant is without sufficient information to either admit or deny the

averments contained in Request for Admission No. 9.  Defendant admits that no

video surveillance tape currently exists for the date in question.  Defendants are

without information sufficient to either admit or deny whether a video surveillance

tape ever existed at the time of the incident.

**REQUEST FOR ADMISSION NO. 10**

That, according to Program Statement 1240.05, ch. 9 (pertaining to
institutional supplements for tool control), at 1, "an institutional supplement
should be issued only when necessary to provide local information or procedures."
See BOP Program Statement 1240.05, ch.9, at 1.

**Response to Request for Admission No. 10:**

Defendant denies the averments contained in Request for Admission No. 10.

Program Statement 1240.05 makes no mention of Institution Supplements.  See

BOP Program Statement 1240.05.

**REQUEST FOR ADMISSION NO. 11**

That an institutional supplement "was implemented on July 30,
2004." For the U.S. Penitentiary at Lewisburg.  See USP Lewisburg Tool
Control Institutional Supplement dated July 30, 2004 and Defendants'
Joint Statement of Material Facts in Support of Motion for Summary
Judgment at 69.

**Response to Request for Admission No. 11:**

Defendant admits the averments contained in Request for Admission

No. 11.

## REQUEST FOR ADMISSION NO. 12

That D. Scott Dodrill, Regional Director, approved the institution
supplement for "policy conformance" on August 10, 2004. See August 10, 2004
Memorandum for Joseph V. Smith, Warden, Bates Stamped Exhibit 475.

**Response to Request for Admission No. 12:**

Defendant admits in part and denies in part the averments contained in

Request for Admission No. 12. Defendant admits that someone in the Northeast

Regional Office reviewed the Institution Supplement LEW 5500.09-CH 4, Tool

Control, and that the Institution Supplement was approved on August 10, 2004 by

staff in the Northeast Regional Office. Defendant denies that the Institution

Supplement was specifically reviewed or approved by then Regional Director D.

Scott Dodrill. See August 10, 2004 Memorandum to Joseph V. Smith, Warden,

which was signed by another individual on behalf of Regional Director Dodrill,

Bates Stamp DEF-475.

## REQUEST FOR ADMISSION NO. 13

That a signed copy of the updated supplement was sent to Chuck Malorana,
Correctional Services Administrator of the Northeast Regional Office, and copied

to the file and to B. Clay, Captain on August 19, 2004.  See August 19, 2004 Memorandum, Bates Stamped Exhibit 474.

**Response to Admission No. 13:**

Defendant admits the averments contained Request for Admission No. 13.[1]

## REQUEST FOR ADMISSION NO. 14

That with respect to class B tools, the Institutional Supplement states, "[c]lass B tools may be issued to inmates only when authorized by the Detail Foreman and used under intermittent supervision not to exceed two hours."  See USP Lewisburg Tool Control Institutional Supplement, at 7.

**Response to Request for Admission No. 14:**

Defendant admits the averments contained in Request for Admission No.

14.

## REQUEST FOR ADMISSION NO. 15

That the Institutional Supplement requires a foreman who needs to send an inmate on a job to issue the inmate a metal tool box and then draw a padlock and attach it to the tool box.  See id. at 8-9.

**Response to Request for Admission No. 15:**

Defendant admits in part and denies in part the averments contained in

Request for Admission No. 15.  Defendant admits that the Institution Supplement

---

[1] The correct spelling of the Correctional Services Administrator's name was Chuck Maiorana.

requires the use of a metal toolbox and padlock for inmates who are being sent

from one department in the prison, to perform a job in another department in the

prison.  Defendants deny that this Institution Supplement applied specifically to

UNICOR or that it specifically addressed the use of tools within UNICOR.  See

Institution Supplement LEW 5500-09, CH4, at 9.


**REQUEST FOR ADMISSION NO. 16**

That the Institutional Supplement requires a foreman to issue a work pass to
an inmate traveling throughout the facility, listing the tools in the tool box.  Id. at
9.

**Response to Request for Admission No. 16:**

Defendant admits in part and denies in part the averments contained in

Request for Admission No. 16.  Defendant admits that the Institution Supplement

requires the use of a work pass for inmates who are being sent from one

department in the prison, to perform a job in another department within USP

Lewisburg.  Defendant denies that this Institution Supplement applied specifically

to UNICOR or that it specifically addressed the use of tools within UNICOR.  See

Institution Supplement LEW 5500-09, CH4, at 9; Miller Dep. at 40 ¶ 21 to 41

¶ 16; Sheesley Dep. at 48 ¶¶ 19-22.

**REQUEST FOR ADMISSION NO. 17**

That on July 14, 2004, Vardenski was disciplined for being insolent to a staff member and was suspended 10 days. See Vardenski Chronological Disciplinary Record.

**Objection to Request for Admission No. 17:**

Defendant objects to the request on the basis that it is vague and ambiguous.

**Response to Request for Admission No. 17:**

Defendant admits in part and denies in part the averments contained in

Request for Admission No. 17. Defendant admits that on July 14, 2004, Mr.

Vardenski was issued sanctions for being insolent to a staff member, a violation of

Code 312. It is further admitted that a portion of this sanction was suspended for

180 days. A suspended sanction means that execution of the sanction imposed by

the Discipline Hearing Officer would not be immediately executed. To the extent

Plaintiff's request for admission implies that this suspended sanction in any way

related to Plaintiff's assignment to UNICOR, or that removal from UNICOR was

part of the sanction imposed by the Discipline Hearing Officer, it is specifically

denied. See Vardenski Chronological Disciplinary Data, dated August 20, 2004;

Reply Brief in Support of Defendant United States of America's Motion for

Summary Judgment at 8-9; 28 C.F.R. § 541.13(c); BOP Program Statement

8120.02, Work Programs for Inmates.

**REQUEST FOR ADMISSION NO. 18**

That Vardenski underwent a Suspect drug test on August 18, 2004.

See Vardenski Inmate Profile "Assignment History Report."

**Response to Request for Admission No. 18:**

Defendant denies the averments contained in Request for

Admission No. 18.  On August 18, 2004, Mr. Vardenski was

administratively moved from the Random Drug Test Roster to the Suspect

Drug Test Roster.  This change does not indicate that a test was performed

at that time, only that he would be tested more frequently.  See Vardenski

Assignment History Report, dated August 20, 2004; Moscarello Dep. at 33

¶¶ 3-17; Reply Brief in Support of Defendant United States of America's

Motion for Summary Judgment at 8-9.


**REQUEST FOR ADMISSION NO. 19**

That Vardenski was assigned to the Millwright Department on August 20,

2004.  See Defendant's Response to Plaintiff's Amended First Set of

Interrogatories No. 24.

**Objection to Request for Admission No. 19:**

Defendant objects to this request to the extent it is vague and ambiguous.

**Response to Request for Admission No. 19:**

Defendant admits that Vardenski was assigned to Millwright on the date in question. To the extent the request for admission implies August 20, 2004, was the first time Vardenski was assigned to Millwright, it is denied. <u>See</u> Sheesley Dep. at 51 ¶¶ 15-21; Vardenski Assignment History Report, dated August 20, 2004.

**REQUEST FOR ADMISSION NO. 20:**

That it is Defendant's contention that "there were no specific procedures relating to inmates moving throughout the UNICOR factory, or from one area of the factory to another. In general inmates, and particularly those assigned to Millwright, were allowed to move freely throughout the factory, which utilized an open floor design, in order to move to the area in which he was needed for the work assigned." <u>See</u> Response No. 7 to Plaintiff's Amended First Set of Interrogatories Directed to United States of America.

**Response to Request for Admission No. 20:**

Defendant admits the averments contained in Request for Admission No. 20.

**REQUEST FOR ADMISSION NO. 21:**

That inmates working in Millwright during the time period in question were allowed to take tools from the Millwright tool room as needed. <u>See</u> Miller Dep. 32:15-22.

**Response to Request for Admission No. 21:**

Defendant admits the averments contained in Request for Admission No.

21. By way of further answer, Class B tools, such as screwdrivers, were allowed

to be utilized by inmates in accordance with the Program Statement 5500.12,

Chapter 2, Tool and Hazardous Materials and Institutional Supplement LEW

5500.09, CH4, Tool Control. See Program Statement 5500.12, Chapter 2, Tool

and Hazardous Materials; Institutional Supplement LEW 5500.09, CH4, Tool

Control; Laws Dep. at 29 ¶ 16 to 32 ¶ 10; id. at 57 ¶ 16 to 58 ¶ 4; Miller Dep. at

32 ¶ 15 to 36 ¶ 12; Sheesley Dep. at 36 ¶ 2 to 42 ¶ 23.

**REQUEST FOR ADMISSION NO. 22:**

That during the time period in question, Millwright supervisors would not
put a lock on a toolbox when it was taken by an inmate. Id. at 40:3-5.

**Response to Request for Admission No. 22:**

Defendant admits the averments contained in Request for Admission No.

22. By way of further answer, Class B tools, such as screwdrivers, were allowed

to be utilized by inmates in accordance with the Tool Control Policy and

Institutional Supplement. See Program Statement 5500.12, Chapter 2, Tool and

Hazardous Materials; Institutional Supplement LEW 5500.09, CH4, Tool Control;

Laws Dep. at 29 ¶ 16 to 32 ¶10; id. at 57 ¶ 16 to 58 ¶ 4; Miller Dep. at 36 ¶ 13 to

41 ¶ 16.

**REQUEST FOR ADMISSION NO. 23:**

That, during the time period in question, inmates would have to pass through two secure doors if traveling from the Millwright area to the Welding area. See Defendant's Answer and Affirmative Defenses to Plaintiff's Third Amended Complaint at ¶ 14.

**Response to Request for Admission No. 23:**

Defendant admits in part and denies in part the averments contained in

Request for Admission No. 23. Defendant admits that an inmate traveling from

Millwright to Welding could have encountered a maximum of two secure doors.

Defendants deny that these doors were necessarily required to be secured or even

closed at all times. See Laws Dep. at 33 ¶ 17 at. 34 ¶ 17; Miller Dep. at 27 ¶ 22 to

30 ¶ 22; Sheesley Dep. at 58 ¶ 15 to 59 ¶ 8; Slonaker Dep. at 20 ¶ 22 to 34 ¶ 24;

id. at 42 ¶ 1 to 47 ¶ 14.

**REQUEST FOR ADMISSION NO. 24:**

That following the attack, Vardenski had the opportunity to hide his blood stained gloves behind a washing machine, to clean the screwdriver used in the attack, and to drop the screwdriver into a toolbox. See SIS Report, Young Dep. at 36:1 to 37:23; Vardenski Statement (Under Seal); Young Memo, and Defendants' Joint Statement of Material Facts in Support of Motion for Summary Judgment at ¶ 45.

**Response to Request for Admission No. 24:**

Defendant admits in part and denies in part the averments contained in

Request for Admission No. 24. Defendants admit that following the attack,

Vardenski hid the blood stained gloves behind the washing machine, and dropped

the screwdriver he had used as a weapon back into the toolbox after cleaning it.

Defendants deny the remainder of Admission No. 24.  See Defendants' Joint

Statement of Material Facts ¶ 45; SIS Report; Young Dep. at 36 ¶¶ 1-37;

Vardenski Statement (Under Seal); and Young Memo.

**REQUEST FOR ADMISSION NO. 25:**

That Plaintiff is currently wheelchair bound and partially paralyzed due to the incident that occurred on August 20, 2004.  See Defendant's Answer and Affirmative Defenses to Plaintiff's Third Amended Complaint at ¶ 27; see also Defendants' Joint Statement of Material Facts in Support of Motion for Summary Judgment ¶ 10.

**Response to Request for Admission No. 25:**

Defendant admits the averments contained in Request for Admission No.

25.

Peter J. Smith
United States Attorney

Date: July 12, 2011

Michael J. Butler
Assistant U.S. Attorney
PA 81799
Dawn L. Mayko
Paralegal Specialist
U.S. Attorney's Office
228 Walnut Street, 2nd Floor
P.O. Box 11754
Harrisburg, PA 17108
Phone:  717-221-4482
Fax: 717-221-2246
Michael.J.Butler@usdoj.gov

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID E. RICKETTS; | : |
| Plaintiff, | : NO. 1:CV-07-0049 |
| | : |
| v. | : |
| | : |
| THE UNITED STATES OF AMERICA; | : |
| THE FEDERAL BUREAU OF PRISONS: | |
| FEDERAL PRISON INDUSTRIES, INC.; | : (Rambo, J.) |
| RAYMOND LAWS; JOHN SHEESLEY; | : |
| JAY YOUNG; KEITH KRATZER; and | : |
| WARDEN OF FEDERAL PRISON | : |
| INDUSTRIES, INC.; | : |
| Defendants | : |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That on this day, July _12_, 2011, she served a copy of the foregoing

## DEFENDANT UNITED STATES' RESPONSE TO PLAINTIFF'S
## FIRST SET OF REQUEST FOR ADMISSIONS

by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States Mail at Harrisburg, Pennsylvania.

**Attorney for Plaintiff**

James F. Logue, Esquire
103 East Market Street
York, PA 17401

_____
Dawn L. Mayko
Paralegal Specialist

RICKETTS v. A.W. OF UNICOR, et al.
United States District Court for the Middle District of Pennsylvania
Case No. 1:07-CV-0049

# EXHIBIT "E"

Plaintiff's Pretrial Memorandum
November 10, 2011

## LIST OF EXHIBITS

**CASE NUMBER:** 1:07-CV-0049

**JUDGE:** Rambo

**CASE CAPTION:** Ricketts v. United States

**MIDDLE DISTRICT OF PENNSYLVANIA**

| PTF | DFT | DESCRIPTION OF OBJECT OR ITEM | IDENTIFIED | EVIDENCE | RULING | WITNESS ON STAND |
|-----|-----|-------------------------------|-----------|----------|--------|------------------|
| 1 | | Kratzer response to Plaintiff's Interrogs | | | | |
| 2 | | Sheesley response to Plaintiff's Interrogs | | | | |
| 3 | | Defendants' response to Plaintiff's Doc Requests | | | | |
| 4 | | Smith response to Plaintiff's Interrogs | | | | |
| 5 | | Laws response to Plaintiff's Interrogs | | | | |
| 6 | | Young response to Plaintiff's Interrogs | | | | |
| 7 | | United States response to Plaintiff's Interrogs | | | | |
| 8 | | United States supplement response to Interrogs | | | | |
| 9 | | Photographs of assailant evidence; bates 306-09 | | | A | |
| 10 | | Floor plans (6) bates labeled 001-006 | | | | |
| 11 | | Photographs of crime scene bates 380-393 | | | A | |
| 12 | | USP Institution Roster, bates 324-360 | | | | |
| 13 | | UNICOR Field Staffing report, bates 211-212 | | | | |
| 14 | | Warden Smith Report of incident, bates 244-247 | | | A | |

# LIST OF EXHIBITS

**CASE CAPTION: Ricketts v. United States**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**CASE NUMBER: 1:07-CV-0049**
**JUDGE:   Rambo**

| PTF | DFT | DESCRIPTION OF OBJECT OR ITEM | IDENTIFIED | EVIDENCE | RULING | WITNESS ON STAND |
|---|---|---|---|---|---|---|
| _15_ | | UNICOR staff spreadsheet as of September 04 | | | | |
| _16_ | | Plaintiff's inmate trust fund account | | | A | |
| _17_ | | Program Statement 8570.01 bates 3519-3528 | | | A | |
| _18_ | | Program Statement 5521.05 bates 008-017 | | | A | |
| _19_ | | Institution Supplement 5500.09 bates 443-473 | | | A | |
| _20_ | | Supplement correspondence bates 474-475 | | | A | |
| _21_ | | Program Statement 5381.05 bates 477-489 | | | A | |
| _22_ | | Program Statement 5353.01, inmate orgs. | | | A | |
| _23_ | | Program Statement 5500.12 bates 477-489 | | | A | |
| _24_ | | Program Statement 3730.05, Workplace violence | | | A | |
| _25_ | | Program Statement 3906.18, Staff mentoring | | | A | |
| _26_ | | Program Statement P5270.07 bates 67- 176 | | | A | |
| _27_ | | Program Statement 1240.05, Records mgmt | | | A | |
| _28_ | | Program Statement 5251.06, inmate work pay | | | A | |

## LIST OF EXHIBITS

CASE CAPTION: Ricketts v. United States

MIDDLE DISTRICT OF PENNSYLVANIA

CASE NUMBER: 1:07-CV-0049

JUDGE:   Rambo

| PTF | DFT | DESCRIPTION OF OBJECT OR ITEM | IDENTIFIED | EVIDENCE | RULING | WITNESS ON STAND |
|---|---|---|---|---|---|---|
| _29_ | ___ | Program Statement 8120.02 bates 018- | | | A | |
| _30_ | ___ | Program Statement 1315.07, Legal Activities | | | A | |
| _31_ | ___ | Program Statement 8000.01, bates 3545- | | | A | |
| _32_ | ___ | Geisinger Health Billing Records | | | A | |
| _33_ | ___ | William Cameron Ambulance Report | | | A | |
| _34_ | ___ | Evangelical Hospital ER Records | | | A | |
| _35_ | ___ | Geisinger Life Flight Records | | | A | |
| _36_ | ___ | Geisinger Urinalysis and Blood test results | | | A | |
| _37_ | ___ | Geisinger x-ray and MRI result records | | | A | |
| _38_ | ___ | Ricketts's UNICOR work ethic report bate 1080 | | | A | |
| _39_ | ___ | BOP Medical Records bates 1081-3518 (select) | | | A | |
| _40_ | ___ | Program Statement 8121.04, Piece rate pay | | | A | |
| _41_ | ___ | USP Tool Classification bates 491-548 | | | A | |
| _42_ | ___ | Donlin M. Long Curriculum Vitae | | | A | |

**LIST OF EXHIBITS**

CASE CAPTION: Ricketts v. United States

MIDDLE DISTRICT OF PENNSYLVANIA

CASE NUMBER: 1:07-CV-0049

JUDGE:   Rambo

| PTF | DFT | DESCRIPTION OF OBJECT OR ITEM | IDENTIFIED | EVIDENCE | RULING | WITNESS ON STAND |
|-----|-----|-------------------------------|------------|----------|--------|------------------|
| 43_ |     | Donlin M. Long July 18, 2011 expert report |  |  | A |  |
| 44_ |     | Donlin M. Long August 18, 2011 expert report |  |  |  |  |
| 45_ |     | Sheesley memo to Bergen, bates labeled 261 |  |  | A |  |
| 46_ |     | Sheesley lost or missing tool report, bates 310 |  |  | A |  |
| 47_ |     | Young memo, Incident in Weld 2, bates 270 |  |  | A |  |
| 48_ |     | Rhinehart memo re stabbing bates 263 |  |  | A |  |
| 49_ |     | Slonaker memo to Heath bates 267 |  |  | A |  |
| 50_ |     | Heath memo to Warden Smith bates 251-259 |  |  | A |  |
| 51_ |     | Millwright door check-in sheet, bates 230 |  |  | A |  |
| 52_ |     | Weld 2 door check in sheet, bates 225 |  |  | A |  |
| 53_ |     | K. Gabrielson memo to Heath bates 265 |  |  | A |  |
| 54_ |     | Weld 2 Roster Bates labeled 395 |  |  | A |  |
| 55_ |     | Standard PA life expectancy guidelines |  |  |  |  |
| 56_ |     | 18 photographs of UNICOR facility |  |  | A |  |

LIST OF EXHIBITS

CASE NUMBER: 1:07-CV-0049

JUDGE:   Rambo

CASE CAPTION: Ricketts v. United States
MIDDLE DISTRICT OF PENNSYLVANIA

| PTF | DFT | DESCRIPTION OF OBJECT OR ITEM | IDENITFIED | EVIDENCE | RULING | WITNESS ON STAND |
|---|---|---|---|---|---|---|
| _57_ | | MRI/x-ray electronic images from Geisinger | | | A | |
| _58_ | | Vardenski guilty plea dated January 3, 2005 | | | A | |
| _59_ | | Edinger memorandum to Hoekman, bates 273 | | | A | |
| _60_ | | Moscarello memorandum to Heath, bates 276 | | | A | |
| _61_ | | Vardenski Inmate Profile, in possession Butler | | | | |
| _62_ | | Vardenski Inmate Profile, 1 page | | | | |
| _63_ | | Vardenski Inmate Discipline Data, 1 page | | | | |
| _64_ | | Vardenski Assignment History Report 4 pages | | | | |
| _65_ | | Smith Deposition transcript, April 8, 2010 | | | | |
| _66_ | | Laws Deposition transcript, January 7, 2010 | | | | |
| _67_ | | Demonstrative model of spine | | | | |
| _68_ | | Affidavit of Ray Hoekman dated 10/3/2008 | | | | |
| _69_ | | Affidavit of Ray Laws dated 10/6/2008 | | | | |
| _70_ | | Ricketts' medical records May-present bates: | | | A | |

RICKETTS v. A.W. OF UNICOR, et al.
United States District Court for the Middle District of Pennsylvania
Case No. 1:07-CV-0049

# EXHIBIT "F"

Plaintiff's Pretrial Memorandum
November 10, 2011

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID E. RICKETTS;                          :
           Plaintiff,                    : NO. 1:CV-07-0049
                                         :
          v.                            : JUDGE RAMBO
                                         :
THE UNITED STATES OF AMERICA;               :
THE FEDERAL BUREAU OF PRISONS               :
FEDERAL PRISON INDUSTRIES, INC.;            :
RAYMOND LAWS; JOHN SHEESLEY;                :
JAY YOUNG; KEITH KRATZER; and               : JURY TRIAL DEMANDED
JOSEPH V. SMITH;                            :
           Defendants                    : Filed Electronically

## FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO LOCAL RULE 48.2

Pursuant to Local Rule 48.2, Plaintiff submits the following findings of fact and conclusions of law attached to Plaintiff's pretrial memorandum:

### FINDINGS OF FACT

1. Federal Prison Industries, Inc. ("FPI" or "UNICOR") is a wholly-owned government corporation, created by Congress in 1934 with the mission of providing work simulation programs and training opportunities for inmates confined in federal correctional facilities.

2. Organizationally, FPI is a component of the Bureau of Prisons ("BOP").

1

3. FPI operates factories in over 100 locations across the country.

4. FPI manufactures products and services in seven different business groups: electronics, clothing & textiles, fleet management & vehicular components, services, office furniture, recycling, and industrial products.

5. An inmate with Maximum Custody requires ultimate control and supervision. This classification is for individuals who, by their behavior, have been identified as assaultive, predacious, riotous, serious escape risks, or seriously disruptive to the orderly running of the institution.

6. "[Inmates] have the right to be informed of the rules, procedures, and schedules concerning the operation of the institution." 28 C.F.R. 541.12.

7. Pursuant to 18 U.S.C. 4042, "The Bureau of Prisons, under the direction of the Attorney General, shall--...(2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise; (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States...".

8. The United States Department of Justice implemented a Correctional Services Procedures Manual on October 10, 2003, as Program Statement 5500.12.

9.    Pursuant to Program Statement 5500.12 dated 10/10/2003: Security posts

will be established through meaningful post orders; using a standard roster.

Security will be maintained by well-trained, highly professional correctional

staff, guided by clearly written policy and procedures and led by Captains

and Lieutenants who monitor operations, train, advise, and consult with

those staff.  Tools, equipment, and materials will be properly used, stored,

and inventoried.  Continuous inmate accountability will be maintained

through a system of accurate counts and census checks.

10.   Program Statement 5500.12 states "Inmates may use Class B tools under

intermittent supervision.  The tools must be accounted for following each

work period by the Shop Foreman or detail supervisor."

11.   Program Statement 5500.12 states "Each institution is responsible for

developing an Institutional Supplement outlining tool control procedures and

inspection system.  Department heads will be responsible for implementing

this procedure in their departments."

12.   USP Lewisburg implemented an Institution Supplement to Program

Statement 5500.12 on July 30, 2004, as Statement LEW 5500.09.

13.   The Institutional Supplement states that it is the policy of USP Lewisburg to

establish and maintain the accountability of all tools. See Id.

14. Further, the Institutional Supplement states that one of its purposes is to prevent the use of tools in situations hazardous to institution security or individual safety. See Id. at 2.

15. With respect to the allocation of the responsibility of ensuring compliance with the Institutional Supplement, the Supplement states that Department Heads will be responsible for implementing this procedure in their departments. See Id.

16. With respect to class B tools, the Institutional Supplement states, "[c]lass B tools may be issued to inmates only when authorized by the Detail Foreman and used under intermittent supervision not to exceed two hours." See Id. at 7.

17. The Institutional Supplement states, "[w]hen a Foreman needs to send an inmate on a job and the inmate needs to draw tools from the tool room. (sic) The Foreman or Central Tool Room Officer will issue the inmate a metal tool box. The Foreman and inmate will then draw the tools that are needed." See Id. at 8.

18. The Institutional Supplement continues, "[o]nce the tools are given to the Foreman, he will then draw a padlock from the tool room officer and attach it to the tool box." See Id. at 8-9.

19. The Institutional Supplement continues, "[t]he Foreman will then issue the inmate a work pass listing the tools in the tool box." See Id. at 9.

20. The Institutional Supplement continues, "[w]hen the inmate arrives at his destination, the officer will receive the work pass along with the tool box. The officer will then unlock the box and check the tools. If the work pass reflects the correct amount of tools, the Officer will then allow the inmate to do his work." See Id.

21. The Institutional Supplement continues, "[w]hen the inmate has completed the work, he will return to the Officer. The Officer will then check the tool box again, making sure the tools are accounted for." See Id.

22. The Institutional Supplement continues, "[o]nce the tools are accounted for, the tool box will be secured and the inmate will return to his Foreman." See Id.

23. The United States Penitentiary in Lewisburg, Pa. (USP Lewisburg) was a Maximum Security prison.

24. The USP Lewisburg UNICOR factory was part of the Industrial Products Group, and was assigned to make metal containers for the United States Postal Service during the relevant time period.

25. In 2004, there were approximately 400 inmates working in the UNICOR factory at Lewisburg.

26. From 1992 through the early 2000's, Lewisburg's UNICOR welding department employed 5-6 supervisors to oversee the entire welding department.

27. Ricketts and Vardenski both arrived to work in the UNICOR facility at approximately 12:15 p.m. because of a fog restriction that prevented them from working earlier that morning.

28. After proceeding through the "shake down" room, Ricketts went to his work assignment in the weld-2 department; a new welding workshop that had recently opened and was still under construction.

29. As an employee of the Millwright Department, Vardenski was assigned various general maintenance tasks throughout the UNICOR facility when needed.

30. The Millwright Department was managed by John Sheesley (hereinafter "Sheesley"), who supervised a staff of three supervisors, Duane Miller (hereinafter "Miller"), Jay Young (hereinafter "Young"), and Donald Rhinehart (hereinafter "Rhinehart").

31. All of the Millwright Supervisors shared responsibility for the supervision of the various inmates working under their charge.

32. The Millwright department had a door check sheet where attendance was taken before any work was performed.

33. After this check, Sheesley distributed work assignments to Miller,

    Rhinehart, and Young, and those supervisors took selected inmates to

    perform the work.

34. The Millwright Department was isolated from the main UNICOR facility.

35. To travel between the Millwright and the main UNICOR facility, an inmate

    had to exit the Millwright through a locked door, the key to which was only

    held by the four (4) Millwright supervisors, travel a short distance outside,

    and enter into the main UNICOR facility by the steel warehouse.

36. Only Millwright supervisors were capable of opening the door to the

    Millwright to permit an inmate to enter or exit.

37. The Millwright Department also had a room dedicated to the storage of

    Class B tools. Class B tools are those that may be used by inmates under

    intermittent supervision not to exceed two hours. Institution Supplement

    5500. 09 - Ch. 4, p. 7.

38. The Millwright tool room was a small room within the Millwright

    Department with opaque walls, in which tools were stored on a shadow

    board.

39. The tool room was left unlocked during the course of the workday, and

    inmates were free to take tools without any authorization or supervision.

40. While the Millwright department used a chit system (a numbered tool board that hung in each shop) so as to be able to identify which inmate was using which tools at any given time, millwright supervisors made no efforts to prevent tools from being taken and used for what could prove to be an improper purpose by any Millwright inmate.

41. Shortly after arriving in the Millwright Department, Vardenski took advantage of the lack of security measures, entered the open and unsupervised Class-B tool room, and armed himself with a 5 1/4" screwdriver.

42. Vardenski sought and received no authorization to take the screwdriver or any other tool from the tool room, and had no work assignment giving rise to a legitimate need for the screwdriver.

43. Vardenski then exited the Millwright shop through a locked door, access to which can only be granted by a Millwright supervisor, and left the department.

44. Vardenski then proceeded into the main UNICOR building, passing through several different departments and shops on his way to the Weld-2 shop.

45. Despite testifying that he would have immediately questioned an inmate in Weld-2 who was not assigned to work there, Kratzer had permitted Vardenski to enter into the Weld-2 shop to talk and socialize in the past.

46. Despite being seen by at least one Millwright supervisor wandering the facility, Vardenski was not intercepted, stopped, or otherwise questioned.

47. There were no millwright assignments being conducted in Weld-2 during the time period in question.

48. Rhinehart felt no need to stop Vardenski to inquire as to his purpose or destination.

49. Vardenski proceeded without interference by any person of authority to the scene of the crime.

50. Vardenski arrived in the Weld-2 shop, which had recently been opened despite still being under construction.

51. As a result, no security cameras were yet installed.

52. There was no staff office in the Weld-2 shop during the time in question; rather, the officers of Weld 2 were forced to use a locker.

53. Electrical work was still being performed in the Weld-2 shop during the time in question.

54. Vardenski's entrance into the Weld-2 shop was not observed because it was severely understaffed with supervisory employees.

55. On August 20, 2004, there were only two employees assigned to supervise a staff of 41 inmates working in the shop, including Kratzer and Slonaker.

56. While Kratzer was the more experienced of the two supervisors, he was absent from the Weld-2 shop at the time of the attack, leaving Slonaker, an inexperienced guard, to supervise 41 inmates.

57. This, despite there being a history of fights, violence, and other injuries and rules violations in the UNICOR facility, including between 10 and 20 stabbings.

58. Experienced supervisors appreciated the risks inherent in working amongst the inmates at USP-Lewisburg.

59. Such risks included a long history of fights, assaults, stabbings, alcohol and drug abuse, and other similar matters (including the making of home brew in the workplace).

60. Slonaker did not observe Vardenski's suspicious and unwarranted intrusion into the shop.

61. Sloanker was being distracted by an inmate when Vardenski entered the shop.

62. Slonaker testified that he realized the entire situation was "odd", yet did nothing about it.

63. Vardenski was able to enter the shop and proceed down to the welding bay in which Ricketts was working.

64. While Slonaker was distracted, Ricketts was brutally and savagely assaulted from behind.

65. By his own admission, Vardenski stabbed Ricketts in his neck from behind repeatedly because he knew it would "put Ricketts down," because he had previously stabbed inmates in the state prison system.

66. Vardenski then proceeded to kick and stab Ricketts further to ensure that Ricketts was not faking injury.

67. Because Ricketts lay motionless in a pool of his own blood, Vardenski believed that he had killed Ricketts.

68. It would later be determined that Ricketts had been stabbed twenty-three times in the neck and upper back.

69. Vardenski then proceeded back through the UNICOR facility, and back to the Millwright department.

70. No one stopped or questioned Vardenski during his walk back to Millwright, despite his clothes and hands being splattered with blood.

71. On arrival at Millwright, Sheesley opened the locked Millwright door for Vardenski without questioning the stains of Ricketts's blood on Vardenski's hands and clothes, and without inquiring as to Vardenski's previous whereabouts.

72. Vardenski asked Sheesley for a bar of soap to wash Ricketts's blood from the screwdriver and his hands, placed the screwdriver back into the open and unsupervised tool room, and put his bloody gloves near the laundry.

73. In total, Vardenski had armed himself, left the Millwright department, travelled across the facility to Weld-2, savagely attempted to murder Ricketts, returned to Millwright, and was able to clean himself up, all before anyone knew that Ricketts had been stabbed.

74. The testimony of UNICOR employees shows a near universal failure to follow these policies found to be mandatory by the Court. Inmates were permitted to access Class B tools without any supervision or authorization.

75. Locked metal toolboxes were not issued during the time in question.

76. No work passes were ever issued to any inmates assigned to work in another part of the facility.

77. This failure was in spite of general awareness that such policies existed.

78. The testimony of the four Millwright supervisors is clear and unambiguous regarding their universal failure to comply with mandatory regulations contained in the Institutional Supplement.

79. The United States has admitted that the Institutional Supplement was in effect and applicable to the UNICOR facility at the time of the assault.

80. Warden Smith testified that adherence to the Institutional Supplement was mandatory.

81. Warden Smith had approximately twenty-years experience in policy development and implementation in the prison system.

82. Warden Smith testified that every staff member is responsible for and involved in the implementation of a policy in making sure that it is being followed.

83. The mandatory regulations for controlling tool security were designed to ensure that such tools are not used in manner detrimental to the health and safety of everyone in the UNICOR facility.

84. While Vardenski was ordinarily assigned to work with Young, Young testified that he instructed Vardenski to stay behind in the Millwright and help out with various tasks, including cleaning and the laundry.

85. Sheesley, however, does not recall seeing Vardenski in the Millwright until he returned after his violent assault of Ricketts.

86. Vadenski's whereabouts on the day of the assault were ignored by those responsible for his supervision.

87. It is undisputed that Vardenski exited the Millwright Department intending to attack Ricketts.

88. Only a Millwright supervisor was able to open the locked door to permit Vardenski to exit the Millwright Department. [1]

89. Vardenski left the room despite being assigned to remain.

90. Only through the negligence of a Millwright supervisor in allowing Vardenski to leave contrary to his work assignment was it possible for Vardenski to exit the Millwright Department.

91. To travel from Millwright to Weld-2, Vardenski would have travelled through several different departments, including the Steel Warehouse, Shearing Department, and the Finished Goods Department.

92. Richard Vardenski suffers from severe psychological disorders that have substantially and adversely impacted his functioning throughout his adult life. He presents a personality disorder. He has suffered from a serious polysubstance abuse & dependence disorder, most recently in the form of a heroin addiction.

93. On October 31, 2003, Inmate Vardenski was disciplined for fighting with another inmate.

94. On July 14, 2004, Inmate Vardenski was again disciplined for being insolent to a staff member, and was "suspended 180 days".

---

[1] While the door would have been opened during a "movement" which would allow Vardenski to escape, Movements only occurred on the hour and only with specific permission. Because of the timing of the assistance call, it is unlikely that a "movement" explains the manner in which Vardenski exited the Millwright Department.

95. On August 18, 2004, Mr. Vardenski's had and/or underwent a "suspect drug test." This differs from previous entries in Mr. Vardenski's Inmate Profile that indicate "Random Drug test".

96. UNICOR maintained a suspect drug abuser list. If an inmate was placed on that list, staff could do a three (3) time drug test on the inmate.

97. Mr. Vardenski used the attack as a way of being transferred to another facility instead of being forced into the Special Housing Unit.

98. Mr. Vardenski was a known problem in UNICOR.

99. Mr. Vardenski should have been forbidden from working in the UNICOR facility on the day in question.

100. This incident was premeditated due to Mr. Vardenski concealing tobacco in his rectum because the Special Housing Unit is tobacco free.

101. Mr. Slonaker was not familiar with the inmates he was working with in Weld 2, where Plaintiff was stabbed.

102. Mr. Slonaker did not have any experience working in UNICOR when he started there.

103. Mr. Slonaker did not receive training when he began at UNICOR, other than Mr. Kratzer training him on policies.

104. It takes an experienced guard to ascertain whether an inmate is legitimately attempting to create a diversion and/or to distract staff.

105.     UNICOR staff was on notice of Mr. Vardenski's vicious propensities.

106.     Welding was a common area for assaults and misconduct.

107.     Staff was aware that inmates manufactured alcohol in the UNICOR facility.

108.     There was a previous stabbing in the same building where Plaintiff was stabbed.

109.     Sheesley testified that inmates needed no staff authorization to get a tool.

110.     Sheesley testified that the taking and returning of tools by an inmate in Millwright required no staff supervision.

111.     Sheesley testified that inmates never needed a work pass when the inmate had a tool.

112.     Rhinehart testified that no work passes were used.

113.     Duane Miller testified that there was no one monitoring the tool room and that inmates were free to take tools as needed.

114.     Duane Miller testified that there are no restrictions relating to when an inmate can procure a class B tool.

115.     Duane Miller testified that inmates can get class B tools without approval of a staff member.

116.     Duane Miller testified that inmates can use class B tools without any supervision.

117.     Duane Miller testified that a supervisor would not put a lock on a toolbox when it was taken by an inmate.

118.     Duane Miller testified that Millwright did not issue work passes to inmates who went out of the shop to complete a job.

119.     Sheesley testified that an inmate could go anywhere with a class B tool unsupervised.

120.     Rhinehart testified that inmates could use class B tools without supervision.

121.     Rhinehart testified that he was aware of the existence of a tool policy.

122.     Jay Young testified that inmates did not need permission to get a tool from the tool room.

123.     Young testified that inmates were not issued work passes listing the tools needed for a particular job.

124.     Young testified that no supervisor/foreman ever put a lock on a toolbox.

125.     Plaintiff was found at approximately 1:00 p.m. on August 20, 2004.

126.    Plaintiff was found lying on the floor with his legs underneath him, while leaning against the wall.

127.    Plaintiff was found inside a welding bay.

128.    Plaintiff was rushed to Evangelical Community Hospital on August 20, 2004, where he was administered a chest tube (a chest tube is a flexible plastic tube that is inserted through the side of the chest into the pleural space. It is used to remove air, fluid, or pus), which drained approximately 300 cubic centimeters of blood from the left side of his chest.  Because of his serious condition, Ricketts was then prepared for life flight via helicopter to Geisenger Medical Center for intensive care.

129.    Plaintiff next treated with Geisenger in its intensive care unit from August 20, 2004 through September 7, 2004.

130.    On September 7, 2004, Plaintiff was transferred to Devens, Massachusetts, Medical facility.

131.    On November 24, 2004, Plaintiff was released to report to Springfield Medical facility for the highest level of rehabilitation and long-term care for his hemiparalysis, although this transfer did not occur until April of 2005.

132.    Ricketts treated at Devens until April 4, 2005, when he was finally transferred to the Springfield, Missouri medical facility.

133.    Plaintiff has been treating at Springfield until the present time.

18

134.   As a result of the assault, Plaintiff suffered twenty-three stab wounds to his neck, two fractured vertebrae, blood in his chest cavity, a partially severed spinal cord, paralysis on the left side of his body, hemiplegia, post traumatic stress order, significant weight loss, and depression.

135.   Plaintiff is right-handed.

136.   Plaintiff was forced to treat at Geisinger Medical facility from August 20, 2004 until September 8, 2004, until he could even safely be transferred.

137.   Although it was recommended that Ricketts treat at the medical center in Springfield, Missouri, he could not immediately be transferred there due to his unresolved pneumothorax (blood trapped in the chest cavity).

138.   Plaintiff was, therefore, transferred to Devens Medical facility, where he would treat until April 4, 2005.

139.   On November 24, 2004, Plaintiff was released to travel to Springfield, Missouri, but this never occurred until April 4, 2005.

140.   From late August of 2004 through late August of 2006, Plaintiff treated in intensive physical therapy (normally 5 days out of the week).

141.   On August 31, 2006, Plaintiff was discharged from physical therapy, as it was felt there was nothing more that could be done for his condition.

142.   In the year 2007, Ricketts sustained numerous slip and fall incidents due to his condition, which caused him increased pain and debilitation.

143.    Plaintiff did not have use of his right hand until sometime in late 2007 /early 2008.

144.    In and around the beginning of 2008, Ricketts began suffering with increased gastro-intestinal issues.  It was felt that his stomach problems were as the result of his medications. This caused Ricketts's weight to drop, causing weakness and lethargy.

145.    In and around the 2009 time period, Ricketts began expressing complaints that he did not have control of his urination on a consistent basis.

146.    In and around 2010, Ricketts's muscle spasms and chronic pain syndrome had reached a plateau, as his doctors consistently noted that his symptoms remained the same/ unimproved.  They continued to adjust his pain medication dosage to no avail.

147.    As of 2010, Plaintiff has consistently rated his pain level at a 7 out of 10, 10 being the highest.

148.    Plaintiff could not even think about the assault for quite awhile after the stabbing happened.

149.    Plaintiff is currently only taking 2 medications, Clonazepam and Baclofen.

150.    Clonazepam is used to treat seizure and panic disorder.

151.    Baclofen is a muscle relaxer and an antispastic agent used to treat muscle spasm, pain, and stiffness.

152.    Plaintiff had been, up through May of 2011, receiving a heavy dose of pain medications, which last included Morphine Sulfate.

153.    Plaintiff's pain medications were arbitrarily stopped after Plaintiff was accused of misusing his medications in May of 2011.

154.    Plaintiff has filed an administrative appeal to the BOP regarding revocation of his pain medication, which appeal is pending.

155.    Therefore, Plaintiff has been forced to endure additional pain and suffering, at pain levels of 10 out of 10 since May of 2011.

156.    Plaintiff continues to be completely paralyzed on the left side of his body, with limited mobility on the right side.

157.    The right side of Plaintiff's body continues to be numb.

158.    Cold temperatures exacerbate Plaintiff's painful left-sided spasms.

159.    The only relieving factors of Plaintiff's spasms, as listed in his medical records, are narcotics and rest.

160.    Plaintiff suffers from insomnia due to his ailments.

161.    Plaintiff suffers from night sweats due to his ailments.

162.    Plaintiff's severely decreased use of his right side has continued despite his use of prescription medication and physical therapy.

21

163.    There is little to no chance that Plaintiff will ever be able to walk again.

164.    Plaintiff currently receives no psychiatric support.

165.    Plaintiff's use of anti-depressants caused him to develop diabetes.

166.    Plaintiff currently only weighs 119 pounds.

167.    Stabbing and sharp are the 2 best words that currently describe the pain on Plaintiff's left side and in his neck.

168.    Plaintiff suffers constant "aches" in his hands and feet on a consistent basis.

169.    Plaintiff currently experiences "grinding in the neck" on a consistent basis.

170.    The pain, left-sided paralysis, and decreased feeling in his right side have caused Plaintiff various psychological effects, such as anger, frustration, and depression.

171.    Prior to his disability, Plaintiff was employed as a welder.

172.    Plaintiff has made his way up the pay scale in UNICOR, being recognized as a skilled craftsman.

173.    Plaintiff has suffered estimated lost wages in the amount of One Hundred Forty Two Thousand Seven-Hundred Forty Dollars ($142,740.00).

174.     As a result of his pain and disability, Plaintiff is not longer able to work in any capacity.

175.     Plaintiff's pain, suffering and loss of enjoyment of life will continue indefinitely.

176.     Donlin Martin Long, M.D., Ph.D., is an expert in neurology, neurosurgery, neuroanatomy, and the pain, symptoms and treatment associated with injuries sustained to the neck and spinal regions.

177.     Plaintiff's bowel and bladder dysfunction represent 25% to 39% impairment for each.

178.     Plaintiff's neurological loss of non-dominant extremity function is 30% to 45% for the upper extremity.

179.     Plaintiff's inability to stand without help, mechanical support or an assistive device also adds 40% to 60% impairment of the whole person.

180.     Based upon the AMA Guides, Plaintiff is in the Class III or Class IV for pain.

181.     A pain rating of this kind adds the affective dysfunction which is his depression.

182.     A combination of the hemiplegia, the loss of bowel and bladder function and the added factor of severe pain and depression combine to

render Plaintiff completely disabled with scores that exceed 100% whole man disability.

183.  It is reasonable to conclude that Plaintiff is completely disabled and using existing guidelines his total disability is 80% or greater.

184.  Pursuant to Pennsylvania's suggested standard civil jury instructions, Plaintiff's life expectancy at the time of the stabbing was 39.8 years (i.e. Plaintiff's is expected to live until approximately the age of 79).


## CONCLUSIONS OF LAW

1. The Federal Tort Claims Act (FCTA) allows federal prisoners to pursue a civil claim against the United States to recover damages for personal injuries sustained during confinement because of the negligence of Government employees. 28 U.S.C. §1346(b)(1); <u>Berman v. United States</u>, 205 F.Supp.2d 362, 363 (M.D.Pa. 2002).

2. The United States may be held liable for tort claims in the same manner and to the same extent as a private individual under like circumstances. 28 U.S.C. §2674.

3. This Court is the trier-of-fact with respect to Ricketts's FTCA claim.

4. The duty of care owed by the Bureau of Prisons (BOP) to federal prisoners is fixed by 18 U.S.C. §4042.

5. Pursuant to the FTCA, the law of the state where alleged act or omission occurred is to be applied. 28 U.S.C. §1346(b)(1).

6. Because the negligent conduct giving rise to Ricketts's FTCA claim occurred at USP-Lewisburg, Pennsylvania state tort law applies. Berman v. United States, 205 F.Supp.2d 362 (M.D.Pa. 2002).

7. To establish a cause of action in negligence in Pennsylvania, the plaintiff must demonstrate that the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage. Martin v. Evans, 711 A.2d 458, 461 (Pa. 1998).

8. The government's duty of care with respect to federal prisoners is that of ordinary diligence. 18 U.S.C. §4042; Turner v. Miller, 679 F.Supp. 441, 442 (M.D.Pa. 1987).

9. Under Pennsylvania law, a plaintiff is required to show that the defendant's negligence was the proximate cause of his injuries by a preponderance of the evidence. Baum v. United States, 541 F.Supp. 1349, 1351 (M.D.Pa. 1982).

10. Pennsylvania law defines proximate cause as causation which was a substantial factor in bringing about the injury. Hami v. Baskline, 481 A.2d 1280, 1284 (Pa. 1978).

11. Plaintiff has administratively exhausted his tort claim against the United States.

12. At all times relevant to this action, individuals employed by the BOP, Federal Prison Industries (UNICOR), and/or USP-Lewisburg, were employees of the United States Government for the purposes of 28 U.S.C. §2671.

13. At all times relevant to this action, Keith Kratzer, David Slonaker, John Sheesley, Jay Young, Donald Rhinehart, Duane Miller, Raymond Laws, and Joseph Smith were employees of the United States Government for the purposes of 28 U.S.C. §2671.

14. At all times relevant to this action, all tools utilized by inmates in UNICOR were monitored and controlled in accordance with Program Statement 5500.12, Correctional Services Manual, Chapter 4, Tools and Hazardous Materials (10/10/2003) (National Policy) and Institution Supplement LEW 5500.09 – CH4, Tool Control (July 30, 2004) (Supplement).

15. Because the explicit purpose behind enacting the National Policy was "[t]o prevent the use of tools in escape attempts or in the manufacture of weapons, or in situations hazardous to institution security or individual safety," employees at USP-Lewisburg and the UNICOR facility therein

have a duty to prevent the use of tools in situations hazardous to institution security or individual safety.

16. The National Policy creates a legal obligation on USP-Lewisburg to develop an Institution Supplement outlining institution-specific tool control procedures and inspection systems.

17. On July 30, 2004, USP-Lewisburg issued an Institutional Supplement containing additional mandatory regulations regarding the safety and security of tools within the UNICOR facility.

18. The Supplement imposes mandatory duties and procedures on staff of USP-Lewisburg with respect to the security of tools used by inmates in the UNICOR facility. Memorandum at 52-53 (doc. 162, under seal)

19. The actions and/or inactions of UNICOR staff on August 20, 2004 relating to tool control and security in the Millwright department constitute a breach of the duty imposed by the mandatory provisions of the Supplement.

20. This breach of duty was a substantial factor in bringing about Ricketts's injuries, because it enabled Vardenski to wrongfully and surreptitiously secure possession of a tool used to assault Ricketts.

21. This breach of duty enabled Vardenski to brutally attack Ricketts on August 20, 2004 and was therefore a substantial factor in bringing about Ricketts's injuries.

22. UNICOR staff has a duty to ensure that all inmates working in the UNICOR facility are accounted-for, and to restrict idle movement without a valid purpose throughout the facility.

23. UNICOR staff breached this duty by failing to account for the whereabouts of Vardenski at the time of the assault.

24. UNICOR staff breached this duty by allowing Vardenski to leave the Millwright Department without a valid reason despite the fact that he was assigned to work inside the Millwright Department.

25. UNICOR staff breached this duty by failing to account for Vardenski's whereabouts and/or failing to intercept him when he was travelling to the Weld-2 shop to attack Ricketts.

26. UNICOR staff's breach of their duty to ensure that all inmates working in the UNICOR facility are accounted-for, and to restrict idle movement without a valid purpose throughout the facility was a substantial factor in bringing about Ricketts's injuries.

27. UNICOR staff had a duty to hire and assign sufficient staff to maintain security of the UNICOR facility at all times during its operation.

28. The United States, BOP, and UNICOR breached this duty by failing to sufficiently staff the Weld-2 shop to supervise the inmates assigned thereto and to ensure proper safety precautions therein.

29. The breach of this duty was a substantial factor in bringing about Ricketts's injuries.

30. The United States, BOP, and UNICOR had a duty to ensure that only those inmates qualified to work in the UNICOR facility under the applicable Program Statement, rules, and/or regulations are permitted to work in the UNICOR facility.

31. The United States, BOP, and UNICOR breached this duty by failing to exclude Vardenski from working in the UNICOR facility prior to the August 20, 2004 assault on Ricketts in accordance with the applicable Program Statement, rules, and/or regulations.

32. This breach of duty was a substantial factor in bringing about Ricketts's injuries.

33. The United States, BOP, and UNICOR had a duty to ensure that the shops in its facility were properly and adequately set up for purposes of safety and supervision of inmates.

34. The United States, BOP, and UNICOR breached that duty by operating the Weld-2 shop while it was incomplete and improperly set up for purposes of safety and supervision of inmates.

35. This breach of duty was a substantial factor in bringing about Ricketts's injuries.

36. The criminal act of Vardenski in assaulting Ricketts was a foreseeable consequence of the negligent conduct of the United States, the BOP, UNICOR, and any employees thereof.

37. That an inmate might take advantage of the negligent supervision of tools and personnel in the UNICOR facility at USP-Lewisburg to wrongfully procure a tool used to assault an inmate or staff member was foreseeable, given the history of similar acts of violence occurring in the UNICOR facility prior to August 20, 2004.

38. As a result of the foregoing negligence, the United States is liable under the FTCA to Ricketts for the injuries he sustained in the assault by Vardenski on August 20, 2004.

39. The FTCA provides for the recovery of compensatory damages. 28 U.S.C. §1346(b).

40. The objective in awarding compensatory damages is to place the Plaintiff in the same position in which he would have been if his injury had not occurred.

41. Ricketts has suffered significant damages as a result of the August 20, 2004 assault by Vardenski.

42. The United States is liable to Ricketts under the FTCA for damages arising out of the August 20, 2004 assault, including compensation for past, present and future physical pain, mental anguish, and loss of enjoyment of life, loss of income, medical expenses, and future medical treatment, loss of income and/or expenses.

Respectfully Submitted,

**BENNLAWFIRM**

Date: November 10, 2011

s/ James F. Logue, Esquire
Pa. ID No. 202170
Gregory E. Monskie, Esquire
Pa. ID No. 206103
103 East Market Street
York, PA 17401
Tel: (717) 852-7020
Fax: (717) 852-8797
jlogue@bennlawfirm.com
gmonskie@bennlawfirm.com
www.bennlawfirm.com

31

## CERTIFICATE OF SERVICE

I, the undersigned, in accordance with Fed.R.Civ.P. 5, hereby certify that a copy of the foregoing **Findings of Fact and Conclusions of Law Pursuant to Local Rule 48.2** was served on the following individuals on the date and in the manner set forth below:

**Via Electronic Filing:**
Michael Butler, Esquire
United States Attorney's Office
228 Walnut Street
Suite 220
Harrisburg, PA 17108
(717) 221-4482

Date: November 10, 2011      By:      s/ James F. Logue, Esq.
                                               Attorney for Plaintiff